2011 UT 51

**The STATE of Utah, in the interest of T.E., a person under eighteen years of age.**

**R.E., Petitioner,**

**v.**

**B.B., Respondent.**

No. 20090638.

Supreme Court of Utah.

Aug. 23, 2011.

Kenneth L. Combs, St. George, for petitioner.

Brent M. Brindley, St. George, for respondent.

Martha M. Pierce, Salt Lake City, for the Office of the Guardian Ad Litem.

Associate Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 In this case, R.E. (Father) argues that the court of appeals erred in affirming the juvenile court's termination of his parental rights in T.E., his biological child. On certiorari, we address three issues. First, we must determine whether the court of appeals erred in upholding the juvenile court's finding that Father had abandoned T.E. Second, we must decide whether the court of appeals erred in concluding that, even if Father did not abandon T.E., there was another permissible ground to terminate Father's parental rights because it was apparent on the record that Father made only "token efforts" to communicate with T.E. Finally, we must determine whether the court of appeals erred in upholding the juvenile court's use of Father's statements at the termination hearing in its analysis of whether termination of parental rights was in T.E.'s best interest.

¶ 2 We hold that the court of appeals erred in concluding that Father had abandoned T.E. because the court did not evaluate whether Father's evidence showed that he did not "consciously disregard" his parental obligations. In addition, we hold that the court of appeals erred in affirming the juvenile court on the alternative ground because it is not apparent on the record that Father made only "token efforts" to communicate with T.E. Finally, we hold that the court of appeals was correct in upholding the juvenile court's use of Father's statements because they were probative of whether termination of parental rights was in T.E.'s best interest.

## BACKGROUND

¶ 3 When T.E. was born in 1999, Father was married to B.B. (Mother). Approximately two years after T.E.'s birth, Father and Mother separated, and Mother became T.E.'s primary caregiver. Father and Mother divorced in 2003. Although Father retained the right to visit T.E. after the divorce, Father's pattern of visitation was inconsistent. For example, there were periods of time when Father visited T.E. regularly and periods of time when Father would go weeks or months without visiting T.E. As a result of Father's irregular visits, T.E. isolated himself, cried himself to sleep, and lashed out at others physically and verbally.

¶ 4 After a visit between Father and T.E. in February 2004, Mother smelled marijuana smoke when she retrieved T.E. from Father's home. Mother then obtained a protective order prohibiting Father from contacting T.E. from February 2004 to December 2005. During that period, Mother tried to terminate Father's parental rights, but the juvenile court denied her petition. In December 2005, the protective order was modified to allow Father to visit T.E. for three hours per week. Father visited T.E. on the terms allowed by the modified protective order, and normal visitation rights were restored in January 2006. After his normal visitation rights were restored, Father again began his inconsistent pattern of visiting T.E.

¶ 5 Because Mother and Father did not get along with each other, they agreed that Father's mother (Grandmother) would serve as a liaison between them to schedule Father's visits with T.E. Accordingly, Grandmother scheduled a visit between Father and T.E. on April 1, 2007. After that visit, Mother stopped returning or answering Grandmother's phone calls about additional visits.

¶ 6 On October 18, 2007, Grandmother visited T.E. at his school and ate lunch with him. At this visit, Grandmother gave T.E. a

birthday card from Father. When Mother learned of Grandmother's visit with T.E., she became angry with school personnel and said that she could not let Father into T.E.'s life.

¶ 7 Mother then continued to ignore Grandmother's attempts to schedule visits between Father and T.E. In December 2007, Mother reinitiated her efforts to terminate Father's parental rights by filing a second termination petition in juvenile court. Specifically, Mother alleged that Father had abandoned T.E. because he failed to communicate with T.E. for a period of six months or longer. In response, Father filed a motion to hold Mother in contempt of their divorce decree because he believed Mother was improperly withholding visitation.

¶ 8 The juvenile court held a joint hearing to address Father's motion to hold Mother in contempt and Mother's request to terminate Father's parental rights. The juvenile court found that Mother had improperly rejected an attempt by Father to visit with T.E. in December 2007. The court also concluded that Mother "intentionally ignored the attempts by [Grandmother]" and "did indeed ignore [Grandmother's] phone calls."

¶ 9 In addition, the juvenile court held that pursuant to section 78A–6–508(1)(b) of the Utah Code, Mother established prima facie evidence that Father had abandoned T.E. because he "failed to communicate [with T.E.] by mail, phone or otherwise" from April 2007 to December 2007.[1] The court concluded that by establishing prima facie evidence of abandonment, Mother created a rebuttable presumption that Father had abandoned T.E.

¶ 10 In an effort to rebut this presumption, Father testified about Grandmother's efforts to contact Mother to coordinate his visits with T.E. Father also testified that Mother had interfered with these attempts to schedule his visitation. During the hearing, Father made it clear that he refused to speak with Mother himself and that he would continue to refuse to speak with Mother. Specifically, Father stated, "I am never talking

to her again. I refuse to talk to her" and "I won't talk to [her] anymore. I refuse to. There is nothing anybody can do to change my mind." He also testified that he would not risk his life to save T.E. because he had "two other kids."

¶ 11 After hearing Father's evidence, the juvenile court judge chastised Father for his unwillingness to speak with Mother. Specifically, the judge told Father that he had "seldom heard a statement as childish as the one [Father] said ... when [Father] said 'you can't make me talk to [Mother].'" During this colloquy, Father interrupted the judge with two separate outbursts. First, Father stated that he would "stick by [his] answer" regarding his refusal to communicate with Mother. Second, Father stated that he had "two other kids to worry about." Following Father's outbursts, the judge noted that he was going to research whether he could consider those statements in his determination of whether it was in T.E.'s best interest to terminate Father's parental rights.

¶ 12 Ultimately, the juvenile court concluded that (1) Mother had established a prima facie case of abandonment because Father had no contact with T.E. by mail, telephone, or other means between April 2007 and December 2007; and (2) Father did not meet his burden of rebutting the prima facie evidence of abandonment. Regarding Mother's alleged interference with visitation, the court stated that Father did not "convince [the court] by clear and convincing evidence that [Mother] interfered." The court specifically held that Father failed to rebut the presumption of abandonment because any efforts to communicate with T.E. "were made by [Grandmother] instead of [Father] ... [and] Father's only action was to ask [Grandmother] to make a few (unanswered) phone calls within an eight month period, which is only token efforts anyway."

¶ 13 Although the juvenile court acknowledged that the best interest analysis was "a close call," the court found that it was in

1. The juvenile court also found that Father did not communicate with T.E. from February 2004 to December 2005. But the court concluded that Father's lack of communication during this peri-

od of time was due to Mother's protective order and was "cured by [Father's] later visits" with T.E.

T.E.'s best interest to terminate Father's parental rights. In support of its finding, the court noted that

> Father made two comments that have affected this [c]ourt's decision. First, Father said something like "I stand by what I said," indicating he still refused to communicate with Mother. Next, he said something like, "I have other kids anyway," indicating that rather than change his attitude in the interest of [T.E.], he would simply refocus his ongoing efforts to parent his other children. These statements are neither evidence nor argument, really, but they affected the [c]ourt's decision.
>
> . . . .
>
> But for these statements, the [c]ourt would almost certainly have denied the Mother's [termination] petition. The [c]ourt would likely have ordered the Father to step up his parental role, ordered the Mother to do a better job of making [T.E.] available, and ordered the parties to cooperate and put their feelings aside in the best interest of [T.E.]. But that has been tried once before, and with the attitude of Father, as confirmed in the statements made, the [c]ourt sees clearly that these things won't happen.
>
> . . . .
>
> [W]hile eight months is a long time for no contact, it certainly could be rehabilitated if the parties, and especially the Father, were willing to do so. The difference here is that Father stated plainly, and with conviction, that he would not change his approach to parenting. To do anything other than terminate would do nothing but prolong turmoil in [T.E.'s] life.

Accordingly, the juvenile court terminated Father's parental rights.

¶ 14 Father appealed the juvenile court's order, and the Utah Court of Appeals affirmed the juvenile court's decision to terminate his parental rights.[2] The court of appeals held that Mother had established prima facie evidence of abandonment under section 78A–6–508 of the Utah Code because Father did not communicate with T.E. for six months.[3] In addition, the court concluded that Father failed to rebut the presumption of abandonment because it believed that Grandmother's efforts were irrelevant and that "Mother's less-than-perfect behavior [in not returning Grandmother's phone calls] d[id] not negate the fact that Father failed to communicate with [T.E.] on his own."[4] The court also held that, even if Father had rebutted the presumption of abandonment, the juvenile court's decision could be upheld on an alternative ground because it was apparent on the record that Father engaged in only "token efforts" to communicate with T.E.[5] Finally, the court concluded that the juvenile court properly considered Father's outbursts in its best interest analysis because "trial courts are permitted, even at times expected, to observe[ ] facts such as the witness's appearance and demeanor."[6]

¶ 15 After the court of appeals issued its decision, Father filed a petition for certiorari, which we granted. We have jurisdiction pursuant to section 78A–3–102(3)(a) of the Utah Code.

## STANDARD OF REVIEW

¶ 16 "On certiorari, we review the decision of the court of appeals for correctness, giving no deference to its conclusions of law."[7]

## ANALYSIS

¶ 17 "[T]o terminate parental rights, the juvenile court must make two separate findings."[8] First, the juvenile court must find by clear and convincing evidence[9] that

2. *B.E. v. R.E. (In re T.R.E.)*, 2009 UT App 168, ¶¶ 6–9, 213 P.3d 877.

3. *See id.* ¶¶ 3–4.

4. *Id.* ¶ 8.

5. *See id.* ¶ 7.

6. *Id.* ¶ 5 n. 3 (alteration in original) (internal quotation marks omitted).

7. *State v. White*, 2011 UT 21, ¶ 14, 251 P.3d 820.

8. *M.W. v. A.N. (State ex rel. A.C.M.)*, 2009 UT 30, ¶ 23, 221 P.3d 185.

9. *See* Utah Code Ann. § 78A–6–506(3) (Supp.2011) (setting standard of proof in the termination of parent rights proceedings at clear and convincing evidence).

there is a permissible ground for termination.[10] Section 78A-6-507 of the Utah Code (Section 507) sets out the permissible grounds for terminating parental rights.[11] Two of these grounds are relevant in this case. The first permissible ground is "that the parent has abandoned the child."[12] The second permissible ground is that the parent has made "only token efforts ... to support or communicate with the child."[13]

¶ 18 After finding a permissible ground for termination, the juvenile court must then conclude that termination of parental rights is in the best interest of the child.[14] To determine whether termination of parental rights is in the best interest of the child, the juvenile court must consider "the physical, mental, or emotional condition and needs of the child."[15] In making this decision, the court may also consider any other evidence that is probative of what is in the child's best interest.[16]

¶ 19 With this framework in mind, we now address the three issues presented on certiorari. First, we must determine whether the court of appeals erred in upholding the juvenile court's finding that Father had abandoned T.E. Second, we must decide whether the court of appeals erred in concluding that, even if Father did not abandon T.E., there was another permissible ground to terminate Father's parental rights because it was apparent on the record that Father made only "token efforts" to communicate with T.E. Finally, we must determine whether the court of appeals erred in upholding the juvenile court's use of Father's outbursts in its analysis of whether termination of parental rights was in T.E.'s best interest.

10. *See id.* § 78A-6-507 (listing permissible grounds for termination of parental rights); *see also State ex rel. A.C.M.,* 2009 UT 30, ¶ 23, 221 P.3d 185 (stating that finding a permissible ground for termination is the first step in terminating parental rights). A permissible ground for terminating parental rights is also required by both the United States and Utah Constitutions. *In re J.P.,* 648 P.2d 1364, 1377 (Utah 1982). Both constitutions guarantee that a parent "is entitled to a showing of unfitness, abandonment, or substantial neglect before [his or] her parental rights are terminated." *Id.*

11. *See* UTAH CODE ANN. § 78A-6-507(1). The permissible grounds for terminating parental rights are

(a) that the parent has abandoned the child;
(b) that the parent has neglected or abused the child;
(c) that the parent is unfit or incompetent;
(d)(i) that the child is being cared for in an out-of-home placement under the supervision of the court or the division;
(ii) that the parent has substantially neglected, willfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement; and
(iii) that there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future;
(e) failure of parental adjustment ...;
(f) that only token efforts have been made by the parent:
(i) to support or communicate with the child;
(ii) to prevent neglect of the child;
(iii) to eliminate the risk of serious harm to the child; or
(iv) to avoid being an unfit parent;
(g)(i) that the parent has voluntarily relinquished the parent's parental rights to the child; and
(ii) that termination is in the child's best interest;
(h) that, after ... the child was returned to live in the child's own home, the parent ... refused or failed to give the child proper parental care and protection; or
(i) the terms and conditions of safe relinquishment of a newborn child have been complied with....
*Id.* § 78A-6-507(1)(a)-(i).

12. *Id.* § 78A-6-507(1)(a).

13. *Id.* § 78A-6-507(1)(f)(i).

14. *See id.* § 78A-6-506(3) ("[T]he welfare and best interest of the child [is] of paramount importance in determining whether termination of parental rights shall be ordered."); *see also State ex rel. A.C.M.,* 2009 UT 30, ¶ 23, 221 P.3d 185 (stating that a best interest analysis is the second step in terminating parental rights).

15. UTAH CODE ANN. § 78A-6-509(1)(a) (Supp. 2011).

16. *See id.* § 78A-6-509(1) (recognizing that a court is not limited in what it may consider in determining whether parental rights should be terminated).

I. THE COURT OF APPEALS ERRED IN ITS APPLICATION OF UTAH CODE SECTION 78A–6–508 BECAUSE THE COURT DID NOT APPLY THE APPROPRIATE STANDARD IN EVALUATING WHETHER FATHER HAD REBUTTED THE PRESUMPTION OF ABANDONMENT

¶ 20 As mentioned above, the abandonment of a child is a permissible ground for terminating parental rights.[17] Although our statutes do not define the term "abandonment," our case law has defined abandonment as " 'conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship.' "[18] Thus, a showing of abandonment requires satisfaction of a two-part test. First, the petitioner must demonstrate that the respondent parent has engaged in conduct that implies a conscious disregard for his or her parental obligations.[19] Second, the petitioner must show that the respondent parent's conduct led to the destruction of the parent-child relationship.[20] "Abandonment may be proven by either objective evidence of the parent's conduct or by the expressed, subjective intent of the parent."[21]

¶ 21 This definition of abandonment is supplemented by section 78A–6–508(1)(b) of the Utah Code (Section 508(1)(b)).[22] Section 508(1)(b) provides that it is prima facie evidence of abandonment if a respondent parent "ha[s] failed to communicate with the child by mail, telephone, or otherwise for six months."[23] And by establishing prima facie evidence of abandonment, a petitioner creates a presumption that the respondent parent has abandoned the child.[24] Thus, if a petitioner shows that the respondent parent has failed to communicate with the child for six months, the petitioner has created a presumption (1) that the respondent parent has consciously disregarded his or her parental obligations and (2) that his or her conduct has led to the destruction of the parent-child relationship.

¶ 22 Once prima facie evidence of abandonment has been established, the burden shifts to the respondent parent to rebut the presumption.[25] In rebutting the presumption, respondent parents may present any evidence indicating that they did not consciously disregard their parental obligations or that their conduct did not lead to the destruction of the parent-child relationship.[26] Accordingly, the evidence presented on rebuttal may be broader than the evidence presented to establish the presumption of abandonment.

¶ 23 After a respondent parent has presented evidence on rebuttal, the court must consider the totality of the evidence and determine if there is still clear and convincing evidence to support a finding of abandonment.[27] Thus, respondent parents are not required to demonstrate by clear and convincing evidence that they did not abandon the child. Instead, they need produce only enough evidence to persuade the juvenile court that the petitioner seeking to terminate their parental rights has not established

17. *See* Utah Code Ann. § 78A–6–507(1)(a) (Supp. 2011).

18. *J.C.O. v. Anderson*, 734 P.2d 458, 462 (Utah 1987) (quoting *In re J. Children*, 664 P.2d 1158, 1159 (Utah 1983)).

19. *See id.*

20. *See id.*

21. *Id.*

22. *See* Utah Code Ann. § 78A–6–508(1) (listing four scenarios deemed to establish "prima facie evidence of abandonment").

23. *Id.* § 78A–6–508(1)(b).

24. *See id.*

25. *See State ex rel. M.S. v. Lochner*, 815 P.2d 1325, 1329 (Utah Ct.App.1991).

26. *See, e.g., M.F.K. v. S.B. (In re Adoption of A.F.K.)*, 2009 UT App 198, ¶ 26, 216 P.3d 980 ("[T]he arrangements, the actions, and the intent of the parents are all factors to consider under the necessary, comprehensive abandonment analysis.").

27. *See E.B. v. State (State ex rel. J.B.)*, 2002 UT App 267, ¶ 22, 53 P.3d 958 (describing a respondent parent's burden to rebut a ground for termination of parental rights).

abandonment by clear and convincing evidence.[28] If the juvenile court determines that, in light of all the evidence presented, the petitioner has established abandonment by clear and convincing evidence, the court may proceed to determine whether termination of parental rights is in the best interest of the child.[29]

¶ 24 Consistent with this framework, the first issue on certiorari requires us to determine whether the court of appeals properly upheld the juvenile court's application and construction of Section 508(1)(b). To resolve this question, we must address two issues. First, we must decide whether the court of appeals erred in upholding the juvenile court's finding that Mother established a prima facie case of abandonment under Section 508(1)(b). Second, we must determine whether the court of appeals erred in upholding the juvenile court's finding that Father failed to rebut the prima facie evidence of abandonment. Both issues are addressed below.

A. *The Court of Appeals Correctly Upheld the Juvenile Court's Finding That Mother Established Prima Facie Evidence of Abandonment Under Section 508 (1)(b)*

¶ 25 Section 508(1)(b) provides that there is prima facie evidence of abandonment if a parent "ha[s] failed to communicate with the child by mail, telephone, or otherwise for six months."[30] In this case, the juvenile court found that Mother established prima facie evidence of abandonment because she demonstrated that Father did not successfully communicate with T.E. for a period of six months.[31] And the juvenile court determined that Father's unsuccessful efforts to schedule

visitation are irrelevant to the establishment of a prima facie case of abandonment. The court of appeals upheld the juvenile court's conclusion that Mother established prima facie evidence of abandonment.[32] We agree.

¶ 26 Father argues that the court of appeals erred in two respects in finding that Mother had established prima facie evidence of abandonment. First, he asserts that Grandmother's attempts or efforts to schedule visitation constitute communication under Section 508(1)(b). Second, he argues that Grandmother's visit with T.E. on October 18, 2007, constituted a communication and that this communication eliminated the presumption of abandonment. We disagree with both arguments.

¶ 27 First, contrary to Father's assertion, there is nothing in the plain language of Section 508(1)(b) that allows "attempts" or "efforts" at communication to qualify as a communication. Instead, the provision simply requires a showing that the respondent parent "failed to communicate with the child."[33] Communication is defined as either "[t]he expression or [the] exchange of information."[34] But because the plain language of Section 508(1)(b) requires that a parent communicate "with" the child—and not simply "toward" the child—under the statute, a communication must involve the "exchange of information." If a respondent parent's attempted communications do not reach the child, there has been no exchange of information with the child and therefore no communication under the statute. Thus, a failed attempt by the respondent parent to communicate with the child does not preclude the petitioner from establishing prima facie evidence of abandonment under Section 508(1)(b).[35]

---

**28.** *See, e.g., id.; K.K. v. State (State ex rel. E.K.),* 913 P.2d 771, 775 (Utah Ct.App.1996).

**29.** *See M.W. v. A.N. (State ex rel. A.C.M.),* 2009 UT 30, ¶ 23, 221 P.3d 185.

**30.** Utah Code Ann § 78A–6–508(1)(b).

**31.** *See B.E. v. R.E. (In re T.R.E.),* 2009 UT App 168, ¶ 3, 213 P.3d 877.

**32.** *See id.* ¶ 4.

**33.** Utah Code Ann § 78A–6–508(1)(b).

**34.** Black's Law Dictionary 316 (9th ed. 2009).

**35.** In this respect, we note that Father's actions constitute failed communications with T.E. for two reasons. First, they never successfully reached T.E., so there was no exchange of information with T.E. Second, the communications were with Mother about scheduling visitation and were not with T.E. While such failed attempts to communicate are not relevant in determining whether the petitioner has established prima facie evidence of abandonment, they may be relevant to whether the respondent parent has

¶ 28 Second, while we agree with Father that Grandmother's visit and delivery of the card to T.E. constituted a communication,[36] this visit did not occur within six months of Father's last communication with T.E. Specifically, Father did not successfully communicate with T.E. from April 1, 2007 to October 18, 2007—a period of just over six months. Thus, despite Father's communication with T.E. on October 18, 2007, Mother still established that Father had failed to communicate with T.E. for a period of six months.

¶ 29 Accordingly, the court of appeals did not err in upholding the juvenile court's finding that Mother established prima facie evidence of abandonment.

## B. The Court of Appeals Erred in Upholding the Juvenile Court's Finding That Father Failed to Rebut the Prima Facie Evidence of Abandonment

¶ 30 Because Mother established prima facie evidence of abandonment, the burden shifted to Father to rebut that presumption. As discussed above, to rebut the presumption of abandonment, respondent parents may present any evidence demonstrating that they did not consciously disregard their parental obligations or that their conduct did not destroy the parent-child relationship.[37] Respondent parents need only present sufficient evidence to persuade the court that the petitioner has not established abandonment by clear and convincing evidence.[38]

¶ 31 In this case, Father presented the juvenile court with evidence that between April 2007 and October 2007, Grandmother served as an intermediary and attempted to contact Mother to schedule Father's visits

with T.E. In addition, Father testified that Mother intentionally ignored Grandmother's phone calls. The juvenile court found that Father did not rebut the prima facie case of abandonment because Grandmother's efforts to schedule visitation with T.E. were irrelevant since they "were made by [Grandmother] instead of [Father]." Additionally, the juvenile court did not consider Father's evidence of Mother's interference with visitation because Father did not "convince [the court] by clear and convincing evidence that [Mother] interfered." The court of appeals upheld the juvenile court's conclusion that Father failed to rebut the presumption of abandonment.[39]

¶ 32 Father argues that the court of appeals erred in concluding that he failed to rebut the presumption of abandonment because the court did not evaluate his evidence in the context of whether it demonstrated that he did not consciously disregard his parental obligations. We agree that the court of appeals erred in this respect.

¶ 33 Rather than examine whether Father's evidence demonstrated that he did not consciously disregard his parental obligations, both courts required Father to show that he did in fact communicate with T.E., or had a legitimate reason for his lack of successful communication. The courts also placed an affirmative burden on Father to prove his case by clear and convincing evidence. For example, the juvenile court found that Father did not prove by clear and convincing evidence that Mother interfered with Father's attempts to schedule visitation. The court of appeals upheld the juvenile court's finding that Father failed to rebut the

rebutted the presumption of abandonment arising from the prima facie evidence and to whether the respondent parent has made more than "token efforts" to communicate with the child. *See infra* Parts I.B; II.

**36.** Grandmother testified that when she visited T.E. at his school on October 18, 2007, she gave T.E. a birthday card from Father. Because this card was from Father and reached T.E., it is sufficient to constitute a communication under the "otherwise" language of Section 508(1)(b). Indeed, because the statute permits a parent's

communication with the child "by mail," a letter from the parent that is hand delivered to the child through an intermediary qualifies as a communication.

**37.** *See J.C.O.*, 734 P.2d at 462.

**38.** *See, e.g., State ex rel. J.B.*, 2002 UT App 267, ¶ 22, 53 P.3d 958; *State ex rel. E.K.*, 913 P.2d at 775.

**39.** *In re T.R.E.*, 2009 UT App 168, ¶ 8, 213 P.3d 877.

presumption of abandonment because "Mother's less-than-perfect behavior [in not answering or returning Grandmother's phone calls] does not negate the fact that *Father failed to communicate with [T.E.] on his own*." [40] But as explained above, on rebuttal, Father's evidence was to be evaluated in the context of whether it demonstrated that he did not consciously disregard his parental obligations. And Father did not have to prove his case by clear and convincing evidence; instead, he needed only to present sufficient evidence to convince the court that Mother had not established abandonment by clear and convincing evidence.

¶ 34 In addition, we disagree that Grandmother's efforts are irrelevant to rebut the presumption of abandonment. The court of appeals implicitly accepted the juvenile court's conclusion that Grandmother's efforts to schedule visitation should not be considered because those efforts were not made by Father himself.[41] But under the correct standard, Grandmother's efforts to schedule visitation are relevant to the extent that they demonstrate that Father did not consciously disregard his obligations to T.E. Similarly, evidence of Mother's interference with visitation is relevant to the extent that it shows that Father did not consciously disregard his parental obligations. Thus, the court of appeals erred in failing to evaluate this evidence under the appropriate standard.

¶ 35 As mentioned above, Father's evidence should have been evaluated to determine whether it showed that Father did not consciously disregard his parental obligations to T.E., or that his conduct did not lead to the destruction of the parent-child relationship. While we express no opinion on whether Father's rebuttal evidence is sufficient to

show that Mother did not establish abandonment by clear and convincing evidence, we conclude that the court of appeals erred in failing to evaluate Father's evidence under this standard.

## II. THE COURT OF APPEALS ERRED IN HOLDING THAT FATHER'S PARENTAL RIGHTS COULD BE TERMINATED ON THE ALTERNATIVE GROUND BECAUSE IT IS NOT APPARENT ON THE RECORD THAT FATHER MADE ONLY "TOKEN EFFORTS" TO COMMUNICATE WITH T.E.

¶ 36 We next address whether the court of appeals erred in affirming the juvenile court's termination of Father's parental rights on the alternative ground. It is well settled that "an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record." [42] In this case, the court of appeals concluded that, even assuming that Father had successfully rebutted the prima facie evidence of abandonment, the juvenile court's holding could "easily be affirmed on the alternative ground that Father made only token efforts to communicate with [T.E.]." [43]

¶ 37 As discussed above, Section 507 provides that another permissible ground for terminating parental rights is a showing by clear and convincing evidence that "only token efforts have been made by the parent . . . to support or communicate with the child." [44] Unlike the other statutory grounds for termination, neither Section 507 nor Section 508(1)(b) provides a definition for "token efforts" or gives guidance as to what parental actions evidence such efforts.[45] And al-

---

40. *Id.* (emphasis added).

41. *See id.* ¶¶ 3, 8.

42. *Bailey v. Bayles*, 2002 UT 58, ¶ 20, 52 P.3d 1158.

43. *B.E. v. R.E. (In re T.R.E.)*, 2009 UT App 168, ¶ 7, 213 P.3d 877.

44. Utah Code Ann. § 78A–6–507(1)(f)(i) (Supp. 2011).

45. *Cf. id.* § 78A–6–508 (providing scenarios deemed to establish prima facie evidence of abandonment, prima facie evidence of unfitness, and circumstances and conduct to be evaluated in determining whether a parent is unfit or has neglected the child).

though we have not previously defined what conduct constitutes "token efforts" sufficient to terminate parental rights, the court of appeals has defined "token efforts" as minimal or superficial efforts given the parent's circumstances.[46]

¶ 38 Father argues that, even accepting the court of appeals' definition of "token efforts," the court erred because it is not apparent on the record that Father made only "token efforts" to communicate with T.E. We agree.

¶ 39 The record demonstrates that Mother and Father agreed to use Grandmother as an intermediary to coordinate Father's visits with T.E. Consistent with this agreement, the juvenile court found that between April 2007 and December 2007, Grandmother attempted to contact Mother to schedule Father's visitation with T.E. In addition, the juvenile court found that Mother "intentionally ignored the attempts by [Grandmother]" and "did indeed ignore [Grandmother's] phone calls." Because the record contains evidence of Mother's active attempts to discourage visitation, it is not apparent on the record that, given the circumstances, Father made only minimal or superficial efforts to communicate with T.E.

¶ 40 For the foregoing reasons, we conclude that the court of appeals erred in holding that "the record certainly supports termination of Father's parental rights on [the] alternative ground"[47] that Father made only token efforts to communicate with T.E.

## III. THE COURT OF APPEALS PROPERLY AFFIRMED THE JUVENILE COURT'S USE OF FATHER'S OUTBURSTS IN ITS BEST INTEREST ANALYSIS BECAUSE THE EVIDENCE WAS PROBATIVE OF T.E.'S BEST INTEREST

¶ 41 After finding a permissible ground to terminate parental rights, the juvenile court must consider whether termination of parental rights is in the best interest of the child.[48] To determine whether termination of parental rights is in the best interest of the child, the juvenile court must consider "the physical, mental, or emotional condition and needs of the child."[49] Additionally, the court may consider any evidence that is probative in determining what is in the child's best interest.[50]

¶ 42 In the instant case, Father made two outbursts at the termination hearing. First, Father said he would "stick by [his] answer" regarding his refusal to communicate with Mother. Second, Father stated that he had "two other kids to worry about." The juvenile court ultimately used these statements in its determination that termination of parental rights was in T.E.'s best interest. And the court of appeals affirmed the juvenile court's use of Father's outbursts.[51]

¶ 43 Father argues that the court of appeals erred in affirming the juvenile court's use of these statements because his comments are not probative of whether termination of parental rights is in T.E.'s best interest. We disagree.

¶ 44 As discussed above, a juvenile court may appropriately consider any evidence that is probative of whether termination of parental rights is in the child's best interest.[52] We have previously noted that a

---

46. *P.O. v. S.G. (In re Adoption of B.O.)*, 927 P.2d 202, 209 (Utah Ct.App.1996) (defining "token efforts" as efforts that are "merely simulated; slight or of no real account" (internal quotation marks omitted)); *see also In re S.M.*, 149 S.W.3d 632, 641 nn. 15–16 (Tenn.Ct.App.2004) (listing statutory definition of "token support" as "support that … is insignificant given the parent's means" and "token visitation" as "visitation that … constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child" (internal quotation marks omitted)).

47. *In re T.R.E.*, 2009 UT App 168, ¶ 7, 213 P.3d 877.

48. *See* Utah Code Ann. § 78A-6-506(3) (Supp. 2011) ("[T]he welfare and best interest of the child [is] of paramount importance in determining whether termination of parental rights shall be ordered."); *see also M.W. v. A.N. (State ex rel. A.C.M.)*, 2009 UT 30, ¶ 23, 221 P.3d 185 (stating that a best interest analysis is the second step in terminating parental rights).

49. Utah Code Ann. § 78A-6-509(1)(a).

50. *See id.* § 78A-6-509(1).

51. *See B.E. v. R.E. (In re T.R.E.)*, 2009 UT App 168, ¶¶ 5, 8, 213 P.3d 877.

52. *See* Utah Code Ann § 78A-6-509(1).

party's demeanor may be probative in a best interest analysis.[53] This is because demeanor evidence may be probative of a parent's credibility, a parent's attitude toward his or her child, and a parent's attitude in fulfilling parental obligations.[54]

¶ 45 In this case, the juvenile court had the benefit of seeing Father testify and of observing Father's demeanor during his two outbursts. And Father's outbursts were probative of his attitude in fulfilling his parental obligations to T.E. Thus, the outbursts were relevant in determining whether it was in T.E.'s best interest to terminate Father's parental rights. Because the juvenile court was in the best position to evaluate Father's demeanor and because it was a factor that the juvenile court found probative, we conclude that the court of appeals did not err in upholding the use of Father's outbursts in the juvenile court's best interest analysis.

## CONCLUSION

¶ 46 We hold that the court of appeals erred in concluding that Father had abandoned T.E. because the court evaluated Father's rebuttal evidence under an incorrect standard. In addition, we hold that the court of appeals erred in affirming the juvenile court on the alternative ground because it is not apparent on the record that Father made only "token efforts" to communicate with T.E. Finally, we hold that the court of appeals was correct in upholding the juvenile court's use of Father's outbursts as evidence when evaluating whether termination of parental rights was in T.E.'s best interest.

¶ 47 Because the court of appeals erred, we remand with instructions that the juvenile court evaluate Father's rebuttal evidence consistent with the framework set forth in this opinion.

¶ 48 Chief Justice DURHAM, Justice PARRISH, Justice NEHRING, and Justice LEE concur in Associate Chief Justice DURRANT'S opinion.

---

53. *See, e.g., Hardcastle v. Hardcastle,* 118 Utah 192, 221 P.2d 883, 887 (1950) (stating that in determining the best interest of a child in a custody dispute, the trial judge "had the benefit of seeing the litigants, *observing their demeanor,* and noting their hostility towards each other" (emphasis added)); *see also Butler v. Butler,* 271 Conn. 657, 859 A.2d 26, 31 (2004) (approving of a trial court's use of "the demeanor of the par-

ties" in its determination "that it was in the best interests of the children to award sole custody to the [father]").

54. *See, e.g., In re J. Children,* 664 P.2d 1158, 1161 (Utah 1983); *Hardcastle,* 221 P.2d at 887; *State Dep't of Human Servs. ex rel. Parker v. Irizarry,* 945 P.2d 676, 681 (Utah 1997).